# EXHIBIT A

1

Volume I
Pages 1 to 92
Exhibits 1 to 9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
HOWARD RICHARDSON,                  :
            Plaintiff,              :
                                    :
                                    :
        vs.                         :   Civil Action
                                    :   No. 04-11412-NG
                                    :
SUSA PARTNERSHIP, LP,               :
            Defendant.              :
                                    :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF HOWARD RICHARDSON, a witness
called on behalf of the Defendant, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Jackson Lewis LLP, 75 Park Plaza,
Boston, Massachusetts, on Monday, June 13, 2005,
commencing at 10:35 a.m.

PRESENT:

    Gleason Law Offices
        (by William P. Boland, Esq.)
        163 Merrimack Street, Haverhill, MA 01830,
        for the Plaintiff.

    Jackson Lewis LLP
        (by Thomas Royall Smith, Esq.,
        and Amanda S. Rosenfeld, Esq.)
        75 Park Plaza, Boston, MA 02116,
        for the Defendant.

                * * * * *

14

1      A.    There was no gate to the facility.  It was

2  a drive in.

3      Q.    Was there a lock system that allowed

4  somebody to enter the facility?

5      A.    Yes, to the office.

6      Q.    Did you ever have access to the keys to the

7  office?

8      A.    No.

9      Q.    You never ever had the keys in your

10  possession at any time?

11      A.    Well, only the time that the company had

12  asked me to bring the keys to the managers that were

13  filling in at the facility on the weekend, Saturday

14  and Sunday, because the manager was away.  They

15  asked me to bring the keys to the office over to the

16  individuals that were there.  That was the only

17  time.

18      Q.    Where did you get the keys from?

19      A.    I got the keys from Joseph Cammarata before

20  he left for the weekend with his daughter for a

21  competition.

22      Q.    He asked you to bring the keys to the

23  facility; is that right?

24      A.    Yes, he did.

16

1    give it to your counsel -- just so we can refresh

2    our recollections.

3            The weekend when you indicated that you

4    brought the keys to the facility, was that the

5    weekend of the 20th and 21st of April?

6    A.    Yes, it was.

7    Q.    Of 2002?

8    A.    Right.

9    Q.    The 20th was a Saturday?

10   A.    Yes.

11   Q.    The 21st was a Sunday; is that correct?

12   A.    That's correct.

13   Q.    On Saturday, April 20, were you scheduled

14   at all to work at the facility?

15   A.    No.

16   Q.    Did you at any time on Saturday, April 20,

17   go to the facility?

18   A.    Just to bring the keys over to the managers

19   that were there to run the facility for that

20   Saturday.

21   Q.    How long did it take you to bring the keys

22   to the managers that were running the facility?

23   A.    The time it took to drive from my house to

24   the facility, five minutes.  I don't know.

18

1      Q.   Were the individuals who were there Byron

2  Fiske and John Gorin?

3      A.   I have no idea what the names were.

4      Q.   Were they from the Waltham Storage U.S.A.

5  facility?

6      A.   Yes.

7      Q.   Both of them?

8      A.   Yes, both.

9      Q.   Had you seen them before?

10     A.   Never.

11     Q.   Prior to April 20, 2002, had you ever had a

12  conversation with Marie Fournier about working the

13  weekend of the 20th and 21st of April?

14     A.   No.

15     Q.   When you went to the facility on the 20th

16  in the morning, did you have occasion to go back

17  there later that day?

18     A.   Yes.  At the end of the day where they

19  would be closing, I returned to the facility to pick

20  up the keys from the individuals from Waltham.

21     Q.   Why did you do that?

22     A.   So that I would have the keys to give to

23  the manager or assistant manager, whoever was

24  covering the facility on Sunday.

19

1    Q.   Did you give the keys to anyone covering

2    the facility on Sunday, April 21st of 2002?

3    A.   Yes, I did.

4    Q.   You went there on Sunday and did that?

5    A.   Yes, I did.

6    Q.   Who did you give them to on Sunday?

7    A.   I gave them to Marie.

8    Q.   Fournier?

9    A.   Yes.

10   Q.   On Sunday, April 21st?

11   A.   Yes.

12   Q.   What time of the day was that that you gave

13   them to her?

14   A.   That was around 10 o'clock.

15   Q.   On Sunday?

16   A.   On Sunday, yes.

17   Q.   Did she meet you there on Sunday?

18   A.   No.  She was there working.

19   Q.   She worked on Sunday, the 21st?

20   A.   Yes.  She worked at both facilities.

21   Q.   Meaning both --

22   A.   Meaning she would cover the Bradford

23   facility, and where she was a manager of, the

24   Salisbury Storage U.S.A.

28

1  you had a buzz on when you came to work at about

2  five o'clock on Saturday, April 20th?

3       A.   I didn't go to work on Saturday,

4  April 20th.

5       Q.   When you went to the facility on

6  April 20th, did you tell anybody that you had a buzz

7  on?

8       A.   No.

9       Q.   Did you after the 20th tell anybody that

10  you had a buzz on?

11       A.   On the 21st when I was talking to Marie, I

12  told her I had been drinking Saturday.

13       Q.   So when you came back to the facility at

14  around five, you had been drinking prior to that; is

15  that correct?

16       A.   What do you mean "prior"?

17       Q.   Before five.

18       A.   Oh, yes.

19       Q.   Had you been drinking that afternoon,

20  April 20th?

21       A.   Yes.

22       Q.   When you said to Marie on Sunday, the 21st,

23  "I had a buzz on," you were referring to the fact

24  that you had been drinking on the afternoon of

29

1   Saturday, April 20th?

2       A.    That's correct.

3       Q.    What did you mean when you said you had a

4   buzz on?

5       A.    You know, just a buzz.

6       Q.    You were feeling the alcohol?

7       A.    Yes, I was feeling the alcohol.

8       Q.    Would it be fair to say that you were

9   intoxicated?

10      A.    No, I wouldn't say I was intoxicated to the

11  point of falling down, no.

12      Q.    But you were feeling high?

13      A.    Yes.

14      Q.    That's fair to say?

15      A.    Yes.

16      Q.    How much did you have to drink on

17  April 20th?

18      A.    I don't recall.

19      Q.    Where were you drinking?

20      A.    Up in Lincoln, New Hampshire.

21      Q.    How many drinks do you think you had, five,

22  or six?

23      A.    Around that maybe.

24      Q.    What kinds of drinks?

30

1      A.    Mixed cocktails.

2      Q.    Gin, vodka?

3      A.    Rum, actually.

4      Q.    Rum and Coke?

5      A.    Actually rum and Seven Up.

6      Q.    You had about five or six rum and Seven Ups

7   up in Lincoln, New Hampshire?

8      A.    Yes, approximately.

9      Q.    Is it fair to say that when you came back

10  to the facility at around five o'clock on the 20th,

11  the individuals who were there from the Waltham

12  facility could see that you had had something to

13  drink?

14     A.    I don't know.

15     Q.    You had had at that point five or six

16  drinks, right?

17     A.    Yes.

18     Q.    When you came back, if they concluded that

19  you had alcohol on your breath, you could understand

20  why they concluded that, right?

21     A.    Absolutely.

22     Q.    If they concluded that you were high on

23  alcohol, you could understand that, couldn't you?

24     A.    Well, as an assumption I would say.

42

1   under the influence of alcohol?

2        A.    Yes.

3        Q.    Were you convicted?

4        A.    Yes.

5        Q.    Did you serve any time in jail either

6   before or after your conviction?

7        A.    No.  What, for driving under the influence?

8        Q.    Yes.

9        A.    No.

10       Q.    How many times have you been arrested for

11  driving under the influence?

12       A.    Three times.

13       Q.    How many times have you been convicted?

14       A.    All three times.

15       Q.    Do you have your driver's license today?

16       A.    It's been revoked.

17       Q.    Do you know if Mr. Cammarata was ever

18  arrested for driving under the influence?

19       A.    I have no idea.

20       Q.    The third time you were convicted for

21  driving under the influence, did you go anywhere for

22  rehabilitation?

23       A.    The third time?

24       Q.    Yes.

48

1      A.    Yes, that's my belief.

2      Q.    Your position is that you were somewhat

3   intoxicated on April 20th, but you were not working

4   on April 20th?

5      A.    That's correct.

6      Q.    Do you have any idea why anyone at the

7   company would say that you were working on

8   April 20th?

9      A.    No idea at all.

10      Q.    You were also told you were terminated

11   because you didn't show up on the 21st of April; is

12   that correct?

13      A.    Yes, as part of it.

14      Q.    Your contention is that that was also not

15   true; is that correct?

16      A.    That's correct.  I was not aware of it.

17      Q.    Do you have any idea why anyone at the

18   company would say that you were scheduled for work

19   on April 21st?

20      A.    No.

21      Q.    Do you have any idea why anyone would?

22      A.    No.

23      Q.    I'm going to show you some documents, if I

24   may.  These documents were premarked.  I will

51

1    you said, "Made a mistake doing a so-called friend a

2    favor, and it got me arrested five years ago.  Did

3    two years.  Have been clean and productive since."

4         A.    Right.

5              MR. BOLAND:  Objection.  For clarification,

6    you asked if that was the only arrest.  Did you mean

7    felony?

8              MR. SMITH:  I said conviction, for a

9    felony.

10             MR. BOLAND:  I didn't hear the word

11   "felony," but go head.

12        Q.    Is that the only one?

13        A.    Yes.

14        Q.    What did you get convicted of a felony for

15   in that case?

16        A.    For sale and possession of cocaine.

17        Q.    Was that your first offense for sale and

18   possession?

19        A.    Conviction.

20        Q.    First conviction?

21        A.    Yes.

22        Q.    You got two years in prison?

23        A.    Yes.

24        Q.    Where did you serve that two years?

52

         A.    Seven months at Middleton.  The rest of it

 1   was at The Farm in Lawrence, prerelease.

 2       Q.    Was your sentence originally two years or

 3   longer?

 4       A.    It was two years and 30 days.

 5       Q.    Did you serve that full time?

 6       A.    Absolutely, every day.

 7       Q.    I would like you to look at Exhibit 3 for

 8   identification, Richardson Exhibit 3.  Do you

 9   recognize this form?

10       A.    (Examines document)  Yes.

11       Q.    Did you complete this form yourself when

12   you applied for employment at SUSA?

13       A.    Yes.

14       Q.    Is this your handwriting on the form?

15       A.    No.

16       Q.    It's not your handwriting?

17       A.    It doesn't look like my handwriting.

18       Q.    Is that your printing up at the top where

19   it says, "Howard Richardson"?

20       A.    No.  I think Marie filled this out.

21       Q.    While she was talking to you?

22       A.    Yes, yes.  She did the questionnaire.  I

23   answered the questions, and she filled it out.

56

1      A.    Well, I don't know what it refers to.

2      Q.    The reference in the beginning of

3  Paragraph 5 to your race, is there anything else

4  that you can testify about as you sit here today

5  that would form the basis of your complaint, other

6  than what you have already testified about?

7      A.    Not offhand.  I can't think of anything

8  else offhand.

9      Q.    I would like you to take a look at

10  Exhibit 5 for identification, please.  If you would

11  turn to Page 7 of that document, please.  Could you

12  tell us whether or not that's your signature.

13      A.    Yes, it is my signature.

14      Q.    Did you read the answers to the

15  interrogatories contained in Exhibit 5 for

16  identification before you signed them?

17      A.    Yes, I did.

18      Q.    To the best of your knowledge, were your

19  answers accurate?

20      A.    To the best of my knowledge.

21      Q.    Would you turn to Page 5 of that document,

22  please.  On Page 5, there's a question about efforts

23  you made to seek employment since April of 2002.

24          In Answer No. 12 you say, "No efforts to

58

1      A.    No, I have not.  No.

2      Q.    It's a fair statement to say that since

3   April 24th, when you were terminated, you have not

4   applied anywhere else for employment?

5      A.    No.  I have not been able to.

6      Q.    What medical problems prevented you from

7   applying elsewhere for employment?

8      A.    My physical condition.

9      Q.    Just for the record, what is the physical

10  condition?

11     A.    I have a septic arthritis infection in my

12  body that has left me with internal problems.

13     Q.    Does that prevent you from working?

14     A.    Yes, it does.

15     Q.    Has it prevented you from working since

16  April of 2002?

17     A.    Actually, from June.

18     Q.    June of 2002?

19     A.    Yes.

20     Q.    To the present time?

21     A.    Yes.

22     Q.    I would like you to take a look at

23  Exhibit 6 for identification, please.  Take a look

24  in the lower right-hand corner.  Is that your

59

1  signature there?

2      A.   (Examines document)  Yes.

3      Q.   Is that your Social Security number to the

4  left of your signature?

5      A.   Yes.

6      Q.   Is this the date that you signed it on the

7  right, April 21st?

8      A.   Yes, I believe it was.  I don't know.

9      Q.   Well, you dated this, correct?

10      A.   Yes.

11      Q.   Referring to the middle of the page where

12  there's a schedule, did you complete that schedule

13  or did somebody else?

14      A.   That was someone else.  That's not my

15  writing.

16      Q.   Do you see on Saturday, April 20 where it

17  says, "nine to ten"?

18      A.   Yes.

19      Q.   And 5:30 to 6:00?

20      A.   Uh-huh.

21      Q.   Then at the bottom where the totals are, it

22  says, "1.5"?

23      A.   Uh-huh.

24      Q.   Did you get paid for 1.5 hours on April 20?

60

1    A.    Not to my knowledge.  I didn't work.

2    Q.    If the company were to produce a record

3  showing that, in fact, you were paid on April 20 for

4  1.5 hours, would that change your opinion?

5    A.    Well, it would be without my knowledge.

6         MR. BOLAND:  Just to clarify, would it

7  change his opinion that he worked or that he was

8  paid?

9         MR. SMITH:  That he was paid.

10         MR. BOLAND:  That's better.

11    A.    If they paid me, I was not aware they were

12  paying me, because I did not work that day at all.

13  I was not there nine to ten.  I was not there five

14  to whatever, six.

15    Q.    5:30 to six.

16    A.    5:30 to six.

17    Q.    It says in the right-hand column, "came

18  back for keys."  Then there are initials.  Do you

19  know whose initials those are?

20    A.    Where?

21         MR. BOLAND:  Right here (indicating).

22    A.    No.  I can't make it out.

23    Q.    Would that be perhaps --

24    A.    I have no idea.

62

1      A.    This isn't my writing.

2      Q.    Please let me finish.  The time for the

3  20th is for the 20th, and you signed this on Sunday,

4  the 21st, correct?

5      A.    Yes, I believe so.  How could I sign that

6  Sunday?

7      Q.    You said you were there on Sunday.  Why

8  wouldn't you sign it when you were there on Sunday?

9      A.    Well, unless I was called back there to

10  sign this for the work for Monday through Friday.

11  But the supervisor didn't even sign it.  That would

12  be signed, also.

13      Q.    Normally the supervisor signs after you

14  sign?

15      A.    Absolutely.

16      Q.    Do you have any idea why somebody would

17  have written in that you worked or -- it shows that

18  you worked nine to ten on the 20th and 5:30 to six

19  on the 20th.  Do you have any idea why somebody

20  would have written that in?

21      A.    No idea, but somebody clearly wrote it in,

22  because that's not my handwriting.

23      Q.    I understand that.  It's not your

24  handwriting on the Monday entries either, on the

64

1   filled out your hours and sometimes your supervisor

2   filled out your hours?

3      A.    Yes.

4      Q.    This particular week, your testimony is

5   that your supervisor filled out your hours or

6   somebody else filled it out?

7      A.    Absolutely.

8      Q.    The hours for Monday through Friday, your

9   testimony is that those are accurate, right?

10      A.    Yes.

11      Q.    It's just Saturday that you are contending

12   is not accurate, right?

13      A.    Absolutely it is not accurate.

14      Q.    It's your testimony that, in fact, that was

15   completed, that Saturday entry was completed after

16   you signed the form?

17      A.    I would have to say so.

18      Q.    Are you sure about that?

19      A.    To the best of my knowledge.

20      Q.    Is it possible you signed the form without

21   reading it carefully?

22      A.    I assume so, reading it.  Yes, it's

23   possible.  I could have signed it without going over

24   it, just taken it as a regular time schedule.

71

1      *A.    No, she did not.  She called me on the

2    telephone.  The conversation was on the phone.

3           MR. BOLAND:  Can I take a break so I can

4    talk to my client.

5           MR. SMITH:  Sure.

6           (Recess).

7           *(Question and answer read)

8      BY MR. SMITH:

9      Q.    Your answer is that there was no meeting?

10     A.    No.  There was never a meeting.

11     Q.    There was never one scheduled?

12     A.    No.  The conversation was on the phone.  I

13   was terminated on the phone.

14     Q.    But there never was a meeting scheduled

15   that you were aware of, correct?

16     A.    No.

17     Q.    When you say "no," you mean no, there was

18   no meeting?

19     A.    Absolutely.  There was no meeting.

20     Q.    Thank you.  Have you been treated for

21   medical conditions in the years 2003 and 2004?

22     A.    To current.

23     Q.    Sorry?

24     A.    To current.  I still am.

72

1     Q.    So the answer to the question is yes?

2     A.    Yes.

3     Q.    You have medical records from treatment in

4    2003 and 2004?

5     A.    Yes, as well as 2005.

6     Q.    Do you have any idea why your attorney made

7    a request to Patriot Ambulance for copies of your

8    medical records in April of 2003?

9     A.    Yes.

10     Q.    Why was that?

11     A.    Because of an incident that transpired with

12    Patriot Ambulance's services.

13     Q.    What was that incident?

14     A.    There was an accident involving the

15    transporting of me.

16     Q.    In other words, while you were in the

17    ambulance, an accident occurred?

18     A.    Well, it was before I got in the ambulance,

19    actually.

20     Q.    What happened?

21     A.    I was mistreated.

22     Q.    By?

23     A.    By the attendant.

24     Q.    How?

73

1      A.   I still can't believe it.  He rammed me
2   into the back of the ambulance.
3      Q.   When you were in a wheelchair?
4      A.   While I was in a gurney.
5      Q.   Have you sued Patriot Ambulance?
6      A.   Not as of yet.  I have not heard anything.
7   I made a complaint against them.
8      Q.   You made a demand for damages?
9      A.   Absolutely.  He jammed me in the ambulance
10  in the gurney.  I was being transported to New
11  England Medical Center.
12     Q.   Did you review any documents prior to
13  coming in here today to testify?
14     A.   No, other than this here (indicating).
15     Q.   The complaint?
16     A.   Which one is this now?
17     Q.   Or the interrogatory answers?
18     A.   This here (indicating).
19     Q.   The interrogatory answers?
20     A.   Yes.
21     Q.   You reviewed those?
22     A.   Yes.
23          MR. SMITH:  Let the record reflect the
24  witness was referring to Exhibit 5 or

87

1   that your signature?

2       A.   Yes.

3       Q.   As a matter of fact, I'm not sure who the

4   notary is, but somebody notarized your signature?

5       A.   Yes.

6       Q.   You appeared before somebody?

7       A.   Yes.

8       Q.   You showed them some kind of

9   identification?

10      A.   Yes.

11      Q.   You were asked by counsel about Exhibit 6,

12  this document.  Do you recall this document?

13      A.   Yes.  It's a time sheet.

14      Q.   You were asked under direct examination if

15  that was your signature.

16      A.   Yes.

17      Q.   Do you recall your answer to that question?

18      A.   I believe I said it looks like my

19  signature.

20      Q.   Is that, in fact, your signature?

21      A.   No, it's not.

22      Q.   It is not?

23      A.   No, it is not.

24      Q.   Why would you say it looks like your

88

1    signature?

2        A.    It's close, but it's not my handwriting.

3    It's definitely not my handwriting.

4            MR. BOLAND:  Nothing further.

5                REDIRECT EXAMINATION

6        BY MR. SMITH:

7        Q.    Would you compare the signature on Exhibit

8    No. 5 for identification, Page 7, and that's the

9    interrogatories, and if you could compare your

10   signature on Page 7 of Exhibit 5 and your signature

11   on the bottom of Exhibit 6.

12       A.    (Examines documents)  Right.

13       Q.    Those signatures appear to be, at least to

14   a laymen, virtually identical.  Why is it your

15   testimony now that that's not your signature on

16   Exhibit 6?

17       A.    Because I don't make my letters as they are

18   on -- what the heck is this document here -- on

19   No. 6.  Exhibit 6 to -- what is this document, 8?

20           MR. BOLAND:  That's 5.

21       A.    In comparison to Exhibit 5, they are not

22   the same.

23       Q.    Mr. Richardson, why did you say initially

24   that was your signature?  Then you left the room

1   with counsel and came back and said that was not

2   your signature.  Why did you change your mind?

3       A.    Well, because I had some time to think

4   about it, and it clearly appears not to be my

5   handwriting.  I mean, at quick glance, it looks

6   close enough.

7       Q.    It looks awfully a lot like the signature

8   on Page 7, doesn't it?

9       A.    No, it does not, not even in the ballpark.

10      Q.    Really?

11      A.    Really.

12      Q.    You thought about that since you testified

13  that it was your signature, and you thought about it

14  and came to the conclusion that it was not your

15  signature without ever even looking at it again; is

16  that right?

17      A.    Actually, I had it right in front of me.

18  Yes, it's not my signature.  I clearly can see it is

19  not.

20      Q.    Your position is that somebody wrote your

21  signature and basically forged your signature; is

22  that your testimony?

23      A.    Appears to be so.

24      Q.    Do you have any idea why somebody would do

90

1    that?

2        A.    I have no clue whatsoever.

3            MR. SMITH:  No further questions.

4                (Whereupon the deposition

5                was suspended at 12:33 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

92

```
 1   COMMONWEALTH OF MASSACHUSETTS)

 2   SUFFOLK, SS.                    )

 3       I, Ken A. DiFraia, Registered Professional

 4   Reporter and Notary Public in and for the

 5   Commonwealth of Massachusetts, do hereby certify

 6   that there came before me on the 13th day of June,

 7   2005, at 10:35 a.m., the person hereinbefore named,

 8   who was by me duly sworn to testify to the truth and

 9   nothing but the truth of his knowledge touching and

10   concerning the matters in controversy in this cause;

11   that he was thereupon examined upon his oath, and

12   his examination reduced to typewriting under my

13   direction; and that the deposition is a true record

14   of the testimony given by the witness.

15       I further certify that I am neither attorney or

16   counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto

18   or financially interested in the action.

19       In witness whereof, I have hereunto set my hand

20   and affixed my notarial seal this 28th day of June,

21   2005.

22                    Ken A. DiFraia

23                    Notary Public

24                    My commission expires 4/3/09
```



DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813