1

                                    Volume I
                                    Pages 1 to 92
                                    Exhibits 1 to 9

           UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
HOWARD RICHARDSON,              :
         Plaintiff,             :
                                :
    vs.                         :  Civil Action
                                :  No. 04-11412-NG
SUSA PARTNERSHIP, LP,           :
         Defendant.             :
                                :
- - - - - - - - - - - - - - - -x

    DEPOSITION OF HOWARD RICHARDSON, a witness called on behalf of the Defendant, taken pursuant t the Federal Rules of Civil Procedure, before Ken A. DiFraia, Registered Professional Reporter and Notar Public in and for the Commonwealth of Massachusetts at the Offices of Jackson Lewis LLP, 75 Park Plaza, Boston, Massachusetts, on Monday, June 13, 2005, commencing at 10:35 a.m.

PRESENT:

    Gleason Law Offices
        (by William P. Boland, Esq.)
        163 Merrimack Street, Haverhill, MA 01830
        for the Plaintiff.

    Jackson Lewis LLP
        (by Thomas Royall Smith, Esq.,
        and Amanda S. Rosenfeld, Esq.)
        75 Park Plaza, Boston, MA 02116,
        for the Defendant.

                * * * * *

                DORIS O. WONG ASSOCIATES, INC.
                  (617) 426-2432 ~ Fax (617) 482-7813

58

1   A.   No, I have not.  No.
2   Q.   It's a fair statement to say that since
3 April 24th, when you were terminated, you have not
4 applied anywhere else for employment?
5   A.   No.  I have not been able to.
6   Q.   What medical problems prevented you from
7 applying elsewhere for employment?
8   A.   My physical condition.
9   Q.   Just for the record, what is the physical
10 condition?
11  A.   I have a septic arthritis infection in my
12 body that has left me with internal problems.
13  Q.   Does that prevent you from working?
14  A.   Yes, it does.
15  Q.   Has it prevented you from working since
16 April of 2002?
17  A.   Actually, from June.
18  Q.   June of 2002?
19  A.   Yes.
20  Q.   To the present time?
21  A.   Yes.
22  Q.   I would like you to take a look at
23 Exhibit 6 for identification, please.  Take a loo
24 in the lower right-hand corner.  Is that your

```
 1  signature there?
 2      A.  (Examines document)  Yes.
 3      Q.  Is that your Social Security number to the
 4  left of your signature?
 5      A.  Yes.
 6      Q.  Is this the date that you signed it on the
 7  right, April 21st?
 8      A.  Yes, I believe it was.  I don't know.
 9      Q.  Well, you dated this, correct?
10      A.  Yes.
11      Q.  Referring to the middle of the page where
12  there's a schedule, did you complete that schedule
13  or did somebody else?
14      A.  That was someone else.  That's not my
15  writing.
16      Q.  Do you see on Saturday, April 20 where it
17  says, "nine to ten"?
18      A.  Yes.
19      Q.  And 5:30 to 6:00?
20      A.  Uh-huh.
21      Q.  Then at the bottom where the totals are, it
22  says, "1.5"?
23      A.  Uh-huh.
24      Q.  Did you get paid for 1.5 hours on April 20?
```

60

1     A.    Not to my knowledge.  I didn't work.
2     Q.    If the company were to produce a record
3  showing that, in fact, you were paid on April 20 for
4  1.5 hours, would that change your opinion?
5     A.    Well, it would be without my knowledge.
6          MR. BOLAND:  Just to clarify, would it
7  change his opinion that he worked or that he was
8  paid?
9          MR. SMITH:  That he was paid.
10         MR. BOLAND:  That's better.
11    A.    If they paid me, I was not aware they were
12 paying me, because I did not work that day at all.
13 I was not there nine to ten.  I was not there five
14 to whatever, six.
15    Q.    5:30 to six.
16    A.    5:30 to six.
17    Q.    It says in the right-hand column, "came
18 back for keys."  Then there are initials.  Do you
19 know whose initials those are?
20    A.    Where?
21         MR. BOLAND:  Right here (indicating).
22    A.    No.  I can't make it out.
23    Q.    Would that be perhaps --
24    A.    I have no idea.

61

1     Q.    Sorry?
2     A.    I said I have no idea.  I don't know whose
3  it is.  I can't make it out.
4     Q.    When you signed this on April 21st, the
5  chart at the top, that shows the hours that you
6  worked and the days you worked was there; is that
7  correct?
8     A.    I don't believe so.
9     Q.    You think it was filled in after you signe
10 it?
11    A.    I believe so.
12    Q.    Do you normally sign blank time reports?
13    A.    Well, no.  It was filled out Monday throu
14 Friday.  That's what I signed.
15    Q.    As you sit here today, your testimony is
16 that after you signed, the time for Saturday was
17 added?
18    A.    Absolutely.
19    Q.    Are you sure of that?
20    A.    I never signed anything like this.
21    Q.    Did you normally sign these when you tur  d
22 in your time every week?
23    A.    Yes.  I would fill it out and sign this.
24    Q.    But the time for the 20th --

1      A.    This isn't my writing.
2      Q.    Please let me finish.  The time for the
3 20th is for the 20th, and you signed this on Sunday,
4 the 21st, correct?
5      A.    Yes, I believe so.  How could I sign that
6 Sunday?
7      Q.    You said you were there on Sunday.  Why
8 wouldn't you sign it when you were there on Sunday?
9      A.    Well, unless I was called back there to
10 sign this for the work for Monday through Friday.
11 But the supervisor didn't even sign it.  That would
12 be signed, also.
13     Q.    Normally the supervisor signs after you
14 sign?
15     A.    Absolutely.
16     Q.    Do you have any idea why somebody would
17 have written in that you worked or -- it shows that
18 you worked nine to ten on the 20th and 5:30 to six
19 on the 20th.  Do you have any idea why somebody
20 would have written that in?
21     A.    No idea, but somebody clearly wrote it in
22 because that's not my handwriting.
23     Q.    I understand that.  It's not your
24 handwriting on the Monday entries either, on the

1  15th, is it?
2      A.   Hour-wise, no.  That is not my figures.
3      Q.   The whole chart was completed by somebody
4  else?
5      A.   Absolutely.
6      Q.   Didn't that happen every week, somebody
7  else completed it?
8      A.   No.
9      Q.   You did?
10     A.   Yes.
11     Q.   But this week you didn't?
12     A.   No, I didn't.  I never had the opportunity
13 either to get this form to fill it out.
14     Q.   If we were to take your time records from
15 other weeks, it would show that you completed the
16 hours and the days chart, and it would be different
17 than this one; is that correct?
18     A.   Well, 90 percent of them.  There was a time
19 or so that Jeff Marshall had put my hours in because
20 I would have been at the Salisbury facility on a
21 Friday.  These time sheets went in Friday evening
22 and I would still be in Salisbury.  Other than that,
23 the majority of them, yes, I filled out my hours.
24     Q.   So is it your testimony that sometimes you

```
 1  filled out your hours and sometimes your supervisor
 2  filled out your hours?
 3      A.   Yes.
 4      Q.   This particular week, your testimony is
 5  that your supervisor filled out your hours or
 6  somebody else filled it out?
 7      A.   Absolutely.
 8      Q.   The hours for Monday through Friday, your
 9  testimony is that those are accurate, right?
10      A.   Yes.
11      Q.   It's just Saturday that you are contending
12  is not accurate, right?
13      A.   Absolutely it is not accurate.
14      Q.   It's your testimony that, in fact, that w
15  completed, that Saturday entry was completed after
16  you signed the form?
17      A.   I would have to say so.
18      Q.   Are you sure about that?
19      A.   To the best of my knowledge.
20      Q.   Is it possible you signed the form witho
21  reading it carefully?
22      A.   I assume so, reading it.  Yes, it's
23  possible.  I could have signed it without going c  er
24  it, just taken it as a regular time schedule.
```

86

1      MR. SMITH: That will help. I doubt
2 seriously we will need to reconvene, but technically
3 I have to keep it open.
4      MR. BOLAND: I will have it signed and
5 forwarded to you. I have some questions.
6                CROSS EXAMINATION
7 BY MR. BOLAND:
8    Q.   Referring to these exhibits, this was
9 referred to by counsel as Exhibit 1, the Storage
10 U.S.A. application?
11   A.   Right.
12   Q.   Are you the author of that? In other
13 words, did you fill that out? Is that your
14 handwriting throughout this whole thing? I
15 understand you were asked if that was your
16 signature. Is this your handwriting?
17   A.   Yes.
18   Q.   Exhibit 4, the complaint, which was marked
19 for identification, you were asked by counsel --
20 sorry. That's not the complaint. That's the
21 interrogatories.
22      MR. SMITH: It's No. 5.
23   Q.   Exhibit 5, you were asked by counsel if you
24 had read and signed these. It was notarized. Is

87

```
 1  that your signature?
 2      A.   Yes.
 3      Q.   As a matter of fact, I'm not sure who the
 4  notary is, but somebody notarized your signature?
 5      A.   Yes.
 6      Q.   You appeared before somebody?
 7      A.   Yes.
 8      Q.   You showed them some kind of
 9  identification?
10      A.   Yes.
11      Q.   You were asked by counsel about Exhibit 6,
12  this document.  Do you recall this document?
13      A.   Yes.  It's a time sheet.
14      Q.   You were asked under direct examination i
15  that was your signature.
16      A.   Yes.
17      Q.   Do you recall your answer to that questic ?
18      A.   I believe I said it looks like my
19  signature.
20      Q.   Is that, in fact, your signature?
21      A.   No, it's not.
22      Q.   It is not?
23      A.   No, it is not.
24      Q.   Why would you say it looks like your
```

                                                                88

1  signature?
2      A.   It's close, but it's not my handwriting.
3  It's definitely not my handwriting.
4          MR. BOLAND:  Nothing further.
5                  REDIRECT EXAMINATION
6  BY MR. SMITH:
7      Q.   Would you compare the signature on Exhibit
8  No. 5 for identification, Page 7, and that's the
9  interrogatories, and if you could compare your
10 signature on Page 7 of Exhibit 5 and your signature
11 on the bottom of Exhibit 6.
12     A.   (Examines documents)  Right.
13     Q.   Those signatures appear to be, at least to
14 a laymen, virtually identical.  Why is it your
15 testimony now that that's not your signature on
16 Exhibit 6?
17     A.   Because I don't make my letters as they a
18 on -- what the heck is this document here -- on
19 No. 6.  Exhibit 6 to -- what is this document, 8?
20         MR. BOLAND:  That's 5.
21     A.   In comparison to Exhibit 5, they are not
22 the same.
23     Q.   Mr. Richardson, why did you say initiall
24 that was your signature?  Then you left the room

1  with counsel and came back and said that was not
2  your signature. Why did you change your mind?
3      A.  Well, because I had some time to think
4  about it, and it clearly appears not to be my
5  handwriting. I mean, at quick glance, it looks
6  close enough.
7      Q.  It looks awfully a lot like the signature
8  on Page 7, doesn't it?
9      A.  No, it does not, not even in the ballpark.
10     Q.  Really?
11     A.  Really.
12     Q.  You thought about that since you testified
13 that it was your signature, and you thought about
14 and came to the conclusion that it was not your
15 signature without ever even looking at it again; i
16 that right?
17     A.  Actually, I had it right in front of me.
18 Yes, it's not my signature. I clearly can see it  s
19 not.
20     Q.  Your position is that somebody wrote you
21 signature and basically forged your signature; is
22 that your testimony?
23     A.  Appears to be so.
24     Q.  Do you have any idea why somebody would

90

1  that?
2      A.    I have no clue whatsoever.
3          MR. SMITH:  No further questions.
4              (Whereupon the deposition
5               was suspended at 12:33 p.m.)

91

1                    C E R T I F I C A T E

2        I, HOWARD RICHARDSON, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify under the pains and penalties of

5    perjury that said transcript (with/without)

6    suggested corrections is a true and accurate record

7    of said testimony.

8        Dated at _____, this ____ day of _____,

9    2005.

10

11                                  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

92

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.                 )
3      I, Ken A. DiFraia, Registered Professional
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, do hereby certify
6  that there came before me on the 13th day of June,
7  2005, at 10:35 a.m., the person hereinbefore named,
8  who was by me duly sworn to testify to the truth an
9  nothing but the truth of his knowledge touching an
10 concerning the matters in controversy in this caus
11 that he was thereupon examined upon his oath, and
12 his examination reduced to typewriting under my
13 direction; and that the deposition is a true recor
14 of the testimony given by the witness.
15     I further certify that I am neither attorney
16 counsel for, nor related to or employed by, any
17 attorney or counsel employed by the parties heret
18 or financially interested in the action.
19     In witness whereof, I have hereunto set my ha
20 and affixed my notarial seal this 28th day of Jun
21 2005.

                          *Ken A. DiFraia*
                          Notary Public
          My commission expires 4/3/09